IDA SKIPPER PARKS *v.* NANNIE B. SKIPPER, ADMINISTRATRIX.

[No. 20, January Term, 1933.]

*Decided March 21st, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*James W. Chapman, Jr.,* and *Herbert E. Perkins,* with whom was *S. Vannort Chapman* on the brief, for the appellant.

*John Y. Offutt* and *L. Wethered Barroll,* with whom was *James J. Lindsay* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

By her bond dated April 13th, 1922, the appellant, Ida Skipper Parks, promised to pay to Armour Fertilizer Works (a New Jersey corporation, hereinafter called Armour) $7,500 on or before February 1st, 1923, and, to secure the payment of the debt so evidenced, executed and delivered a mortgage to Armour on property in Yonkers, New York. By assignment dated December 15th, 1923, Armour assigned the mortgage to Thomas H. Skipper, an attorney at law, who was also the brother of Ida Skipper Parks, the assignment reciting that it did "assign, transfer and set over unto Thomas H. Skipper of Queen Anne's County, State of Maryland, all its title and interest in and to the property acquired through mortgage of Ida Skipper Parks" dated April 13th, 1922, recorded in Westchester County, New York. Thomas H. Skipper died December 14th, 1929, and his widow, Nannie Brice Skipper, appellee, was appointed administratrix of his estate. Amongst his papers she found the mortgage to Armour and the assignment from the mortgagee. Suit was brought by the administratrix against Ida Skipper Parks

in assumpsit on the common counts and a special count, on the covenant in the mortgage to "pay unto the said party of the second part (Armour Fertilizer Works), its successors or assigns, the sum of money mentioned in the said bond or obligation." Code, art. 75, sec. 4; 1 *Poe, Pl. & Pr.,* sec. 63A. The defendant filed the general issue pleas, never promised, never indebted, and payment. From a judgment for the balance which the court, sitting as a jury, found to be due and owing, the defendant appealed. The plaintiff offered in evidence the mortgage as the evidence of debt, and the assignment as its right thereunder to a judgment on the covenant of the defendant to pay, and thus relied on the presumption arising from the execution and possession of a contract under seal. *Brantly on Contracts* (2nd Ed.), 125; 41 *C. J.* 793, 794; *Cumberland Coal & Iron Co. et al. v. Ann Parish,* 42 Md. 598, 600.

The defendant offered evidence of payments made to Armour and to her brother to offset the plaintiff's claim, which the court held to be short of the demands, and rendered a verdict for what it found to be the balance of principal and interest.

The defendant, at the conclusion of the evidence, offered two prayers for an instructed verdict, the first that there was no legally sufficient evidence to entitle the plaintiff to recover, the second, "no legally sufficient evidence to charge the defendant upon the cause of action upon which this suit is brought."

The evidence was that the assignment of the mortgage already mentioned was the only transfer or assignment of the mortgagee's (Armour's) claim against the defendant, the bond which the mortgage secured having remained in the files of Armour's attorney until produced by him at the trial. The defendant claims that under the law of New York the assignment of the mortgage was not sufficient to assign the debt and was nugatory. If this is correct, it would go to the plaintiff's right to recover on the covenant to pay contained in the mortgage.

The defendant became obligated to Armour as guarantor on notes of customers, which had been taken by her husband (now deceased), long an agent of Armour for fertilizer, and the mortgage was given in settlement of those notes. In the interval between the execution of the bond and mortgage and its maturity, it was agreed that an effort be made to collect the notes so as to reduce as much as possible the defendant's liability on the mortgage. The defendant's attorney, Herbert E. Perkins, collected and paid to Armour from May 5th, 1922, to November 13th, 1923, $3,605.02. By his check of November 6th, 1923, he paid to the defendant's brother, Thomas H. Skipper, $1,943.95, one of the Armour notes which had been reduced to judgment, and in addition to this, collections, after the Armour settlement, amounting to $169.31. November 12th, 1923, $3,000 was paid to Armour by a check signed "Thomas H. Skipper, Atty." There is no word in the record as to whose money it was, except that it is contained in memoranda of payments made in 1923 and 1924, some of which were noted as made to or for "I. S. P." In the same account or memorandum is $1,557.12 noted as paid "Armour & Co." December 17th, 1923, which was the amount turned over by Thomas H. Skipper to Mr. Rowland K. Adams, of the Baltimore bar, who represented Armour in the final settlement between it and the defendant. In addition to the payments noted, Arthur S. Skipper, the defendant's nephew, testified that on November 7th, 1922, his uncle asked him for $1,500 of money he had for the settlement of his aunt's affairs, which he gave him, taking a receipt which stated that it was "to be used for the purpose of adjusting claim of Armour Fertilizer Works belonging to Ida Skipper Parks," and signed, "Thomas H. Skipper, Atty." On November 12th, according to the record, "he took his uncle exactly $500 because his uncle had made the final check, that is, figuring the amount of money he had in hand, and that cleared the matter up, that is, the Armour claim, so his uncle told him." The receipt which he took was for $500 "for I. S. Parks to be used in part settlement of claim of Armour Fertilizer Works." We shall not attempt to rec-

oncile the figures, as that involves a question of fact concluded by the verdict.

When the settlement was had with Mr. Adams, he testified "that at that time or just prior, there were two mortgages on two properties of Mrs. Parks on record, one in Queen Anne's County and the other on the Yonkers property, and I believe the release of both these mortgages had been prepared. I am not sure whether Mr. Skipper had requested that, or whether it was done as a routine matter by the Armour Fertilizer Works, but I know before the final settlement was made Mr. Skipper requested that the mortgage in Queen Anne's County be released and the mortgage in Yonkers assigned; that the mortgage on the Queen Anne's County property was released and given to Mr. Skipper at the time of the settlement; that the mortgage on the Yonkers property was assigned by Armour to Thomas H. Skipper; that I have no recollection of any statement made to me only that mortgage was assigned to him." Mrs. Parks was not present then or at any time after the execution of the mortgage in 1922. Mr. Adams also testified that the original bond was and had been in his possession ever since "the final settlement and was never delivered to Thomas H. Skipper."

It undoubtedly was, after the request of Thomas H. Skipper, the intention of the mortgagee to transfer to Thomas H. Skipper, and of the latter to take, whatever of security Armour had for the defendant Ida S. Parks' debt. If the transfer had been of a Maryland mortgage, the assignment of the mortgage would have had that effect. Code, art. 66, sec. 25 (Act of 1892, ch. 392); *Dickey v. Pocomoke City Nat. Bank*, 89 Md. 280, 43 A. 33.

We are not controlled entirely by what the parties did, but may, in determining what they did, ascertain, if we can, what they intended to do. In *Aldridge v. Weems*, 2 G. & J. 36, 47, it was said: "The only question put in issue by this bill and answer, is, whether it was necessary to give legal effect to this assignment, that there should be a delivery of the mortgage by Tongue to the complainants. In examining this case, it is necessary to keep constantly in view, that this

is not a mortgage or deed that requires delivery to give it legal effect, but an assignment of Tongue's interest in the mortgage, that may be good and operative without actual delivery, if there is evidence to shew the party intended it, to transfer his interest in the thing assigned." The assignment, in Tongue's handwriting, was found among his papers after his death. See *Carson v. Phelps,* 40 Md. 73, 97. In the case of *Merritt v. Bartholick,* 36 N. Y. 44, which the defendant cites and urges in support of her contention that in New York the assignment of the mortgage without the bond is nugatory, it is said: "The transfer of the mortgage did not of itself operate to transfer the bond, for the legal maxim is, the incident shall pass by the grant of the principal, but not the principal by the grant of the incident. So that unless we are authorized to say that such was the intent of the parties, we cannot hold that it did. This is a question of fact which the counsel for the appellant argues in his points, but unless the referee has found it, as a fact, or found facts from which we are bound to infer its existence, it is a question not in the province of this court to determine." And again, "The fact that here the transfer was by manual delivery, merely, nothing being said as to the bond, or the indebtedness secured by it, does not afford any stronger evidence of intent to transfer the bond than the case supposed. There is no circumstance in the case not considered in the supposed case, and, as I think, nothing to compel the inference of intent to transfer the bond." In that case, after the delivery to one Wentworth by Merritt, Merritt had in writing assigned the mortgage and bond to another. If the court could, as a fact, have found an intention to transfer or assign the bond to Wentworth, it is easy to imagine what the decision might have been. As it was, two judges, Hunt and Grover, dissented. In the case of *Campbell v. Birch,* 60 N. Y. 214, wherein a mortgage was assigned and the note retained by the mortgagee, the opinion said: "The mortgage was incident to the debt and not to the note; and the retention of the note by Mrs. Hawkins did not conclusively establish that she did not intend to transfer to the plaintiff, with

the mortgage, the debt recited in it. (*Hill v. Beebe*, 13 N. Y. 556.) But, under the circumstances disclosed in the case, the real intention and legal consequence of the transaction was to transfer to the plaintiff the property embraced in the mortgage; as security for his advances, and not to make him simply the assignee of the mortgage." That case was not complicated with the mortgage in the hands of one party and the bond and a written assignment of the mortgage delivered to another, as in *Merritt v. Bartholick, supra.* The defendant's contention that the assignment of the mortgage without the bond is nugatory, might, though we do not so decide, have effect if this proceeding were an attempt to foreclose the mortgage. 19 *R. C. L.* 347, sec. 119. But this is not that kind of a case. It is a suit to recover on the covenant to "pay the indebtedness" secured by the mortgage, and the mortgagee is not restricted to the exercise of the power of sale therein provided; any remedy at law or in equity for the collection of the debt is available to him and his personal representatives. As said in *Wilhelm v. Lee*, 2 Md. Ch. 322: "The rule appears to be perfectly well settled, that a mortgagee may sue at the same time at law upon his bond or covenant, and in equity upon his mortgage; the case of a mortgage forming an exception to the general rule, that a party shall not be permitted to sue at law and here, at the same time, for the same debt. Indeed, the general rule itself applies only to cases where the demand at law and in equity are equally personal and not where the cumulative remedy is *in personam,* while the other remedy is upon the pledge. The remedy in this court, upon the mortgage, is *in rem,* and that at law *in personam.*" The mortgagee "may, in the words of the late Chancellor (Bland), 'sue on all his remedies at the same time,' " though, of course, he can have but one satisfaction of his demand. *Andrews v. Scotton,* 2 Bland, 629, 665, cited in *Gilman v. I. & M. Tel. Co.,* 91 U. S. 603, 615, 23 L. Ed. 405, 410; *Condon v. Rice,* 88 Md. 720, 44 A. 169; *Mizen v. Thomas,* 156 Md. 313, 320, 144 A. 479; 4 *Kent,* 183. It follows, therefore, that in the opinion of this court the mortgage and assignment offered in evidence is

*prima facie* evidence of the defendant's liability on the covenant to pay recited in the mortgage, and the defendant's first prayer for an instructed verdict was properly refused.

What has been said of the first prayer applies with equal force to the second, the defendant's theory being that, assuming the plaintiff's evidence legally insufficient to support the special count, it would not make a *prima facie* case under the common counts. Inasmuch as we find the evidence under the special count legally sufficient, it can support a verdict without reference to the measure of proof required under the common counts. *Conservation Company v. Stimpson,* 136 Md. 314, 110 A. 495.

The defendant also contends that the payments made by Thomas H. Skipper were voluntary, without the authority of the defendant, and that he could not, therefore, make himself her creditor. *Dougherty Co. v. Gring,* 89 Md. 535, 545, 43 A. 912. This contention, if it has any application at all, goes to the payment of $3,000 made by Mr. Skipper to Armour by his check of November 12th, 1923, as, with that out of the case, the balance would be heavily in the defendant's favor. That the payment was made, there is and can be no question. The defendant does not deny it or attempt to explain it, or pretend that the money was hers; she accounted for all other payments made by her or on her behalf, but not a word as to this. The only explanation for the payments, fifteen hundred and five hundred dollars, made to her brother three and eight days later, respectively, would be that it was intended to reimburse him in part at least for the outlay made by him on her behalf, and the court must have so concluded. The court granted an instruction that, if any part of the money paid by Thomas H. Skipper was voluntary, not under compulsion, and without her authority and without her adopting or ratifying such payment, then to the extent of such payment he did not become her creditor, and then found against her on the facts.

Another point which the defendant urges with great force is that Thomas H. Skipper was her attorney and as such could not acquire an interest in the subject-matter of the

suit adverse to hers without her authority, consent, or concurrence. This does not appear to have been specially urged at the trial (Code, art. 5, sec. 10), no ruling having been made with reference to it, unless it be inferred from the burden of proof prayer granted the defendant. The question is largely one of ethics, but may be a determining factor in the adjudication of claims between the attorney and his client. It has been the subject of so many controversies in this court that it is not necessary to look elsewhere for authorities. It is settled that in dealing with the client's property the burden is on the attorney to show his good faith. *McLean v. Maloy,* 136 Md. 467, 111 A. 91; *Etzel v. Duncan,* 112 Md. 346, 76 A. 493; *Merryman v. Euler,* 59 Md. 588; *Roman v. Mali,* 42 Md. 513, 559. The rule generally seems to be that the attorney cannot acquire an interest in the property or subject-matter of a suit for his advantage to the prejudice of his client's interests. 2 *R. C. L.* 966. If this question was raised below, then the verdict for the plaintiff concludes the question here as a finding of fact against the contention. Suffice it to say, however, that while Thomas H. Skipper was an attorney at law acting for the defendant, he was also her brother, serving her without fee or reward and advancing his money to satisfy her debt.

The only other question submitted is on an exception to the refusal of the trial court to allow Herbert E. Perkins, who appears to be the only attorney making collections on the Armour notes, to testify, when recalled by the defendant, as to when he first heard of the assignment to Thomas H. Skipper. He had already testified that he was not present when the settlement with Armour was made and knew nothing about it. Even if he had been permitted to answer, we fail to see how it would have reflected on any issue involved in this case, unless he had been asked to relate any information obtained from Mr. Skipper.

Finding no error in any of the rulings of the court, and the findings on the facts not being reviewable, the judgment will be affirmed.

*Judgment affirmed, with costs.*